# Exhibit A

Michael R. Yellin (Attorney ID #4014712008)
Brandon Fierro (Attorney ID #909052012)
Kori L. Pruett (Attorney ID #416602022)
Amber D. Morrison (Attorney ID #437192023)
**COLE SCHOTZ P.C.**
Court Plaza North
25 Main Street
Hackensack, New Jersey 07602-0800

*Attorneys for Plaintiffs Advanced Flower Capital, Inc. and AFC Agent, LLC*

| | |
|---|---|
| ADVANCED FLOWER CAPITAL, INC. and AFC AGENT, LLC,<br><br>Plaintiffs,<br><br>v.<br><br>BLOC DISPENSARY LLC, SRG 1761 NORTH OLDEN LLC, SRG 1474 PROSPECT LLC, SRG WARETOWN LLC, HAYDEN GATEWAY LLC, PIER COVE LLC, SRG 272 MAIN STREET LLC, and SRG HI PARK LLC,<br><br>Defendants. | SUPERIOR COURT OF NEW JERSEY CHANCERY DIVISION: MERCER COUNTY<br>DOCKET NO. MER-C-000037-26<br><br>Civil Action |

---

### PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR A PRELIMINARY INJUNCTION TO RESTRAIN DEFENDANTS FROM OBSTRUCTING ACCESS TO LOAN COLLATERAL

---

Of Counsel and On the Brief:
   Michael R. Yellin
   Brandon Fierro

On the Brief:
   Kori L. Pruett
   Amber D. Morrison

71686/0001-53374918

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ....................................................................................................... ii

PRELIMINARY STATEMENT ................................................................................................. 1

STATEMENT OF FACTS ......................................................................................................... 2

        A.     The Loan and Its Governing Documents ................................................... 2

        B.     The Maturity Default. ................................................................................ 3

        C.     AFC's Contractual Right to Inspect and Access Collateral. ...................... 4

        D.     The Borrowers' Campaign of Obstruction. ................................................ 5

        E.     The Forthcoming Article 9 Sale. ................................................................ 7

        F.     The Limited Nature of the Status Quo Relief Sought. ............................... 7

LEGAL ARGUMENT ............................................................................................................... 7

    I.     AFC SATISFIES ALL FOUR FACTORS FOR PRELIMINARY
         INJUNCTIVE RELIEF AND IS ENTITLED TO AN ORDER
         RESTRAINING DEFENDANTS FROM OBSTRUCTING ITS
         CONTRACTUAL INSPECTION RIGHTS. ....................................................... 7

        A.     AFC Is Virtually Certain to Succeed on the Merits Because the
             Loan Has Matured, Defendants Have Not Repaid Any Principal,
             and the Credit Agreement Unambiguously Requires Defendants to
             Permit Inspection. ..................................................................................... 9

        B.     AFC Will Suffer Irreparable Harm Every Day It Cannot Inspect
             the Collateral Securing $123 Million in Unpaid Obligations,
             Particularly with the July 28, 2026 Article 9 Sale Approaching. ............. 15

        C.     The Balance of Hardships Overwhelmingly Favors AFC Because
             the Relief Sought Is Modest, Defendants Bargained Away the
             Right to Exclude Their Secured Creditor, and Compliance
             Requires Only Honoring Existing Contractual Obligations. .................... 17

        D.     The Public Interest Strongly Supports Enforcing Negotiated
             Commercial Lending Agreements and Denying Defaulting
             Borrowers the Ability to Obstruct Their Creditors' Contractual
             Rights. ..................................................................................................... 18

CONCLUSION......................................................................................................................... 19

i

71686/0001-53374918

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

Bd. of Educ. v. New Jersey Educ. Assoc.,
96 N.J. Super. 371 (App. Div. 1967), aff'd, 53 N.J. 29 (1968) ...............................................15

CCO Condo Portfolio (AZ) Junior Mezzanine, LLC v. Feldman,
717 F. Supp. 3d 331 (S.D.N.Y. 2024)......................................................................................12

Dee v. Rakower,
112 A.D.3d 204 (2d Dep't 2013) ..............................................................................................8

Del. River and Bay Auth. v. York Hunter Constr., Inc.,
344 N.J. Super. 361 (Ch. Div. 2001) .......................................................................................15

Gilpin v. Jacob Ellis Realty, Inc.,
47 N.J. Super. 26 (App. Div. 1957) .........................................................................................17

Gen. Elec. Co. v. Gem Vacuum Stores,
36 N.J. Super. 234 (App. Div. 1955) .......................................................................................15

Hayden Gateway LLC v. Advanced Flower Capital Inc.,
No. 25-cv-02789-ZNQ (D.N.J.)...............................................................................................13

Marsellis-Warner Corp. v. Rabens,
51 F. Supp. 2d 508, 532 (D.N.J. 1999)………………………………………………………17

Ride the Ducks of Philadelphia, LLC v. Duck Boat Tours, Inc.,
138 Fed. App'x 431 (3d Cir. 2005)..........................................................................................18

St. John's Evangelical Lutheran Church v. City of Hoboken,
195 N.J. Super. 414 (Law Div. 1983) ......................................................................................17

W.W.W. Assocs., Inc. v. Giancontieri,
77 N.Y.2d 157 (1990) ...........................................................................................................8, 10

Waste Mgmt. of N.J., Inc. v. Morris Cnty. Mun. Utils. Auth.,
433 N.J. Super. 445 (App. Div. 2013) ...........................................................................7, 15, 18

**Statutes**

The Controlled Substances Act.................................................................................................14

Cannabis Regulatory, Enforcement Assistance, and Marketplace Modernization
Act, N.J.S.A. 24:6I-31 et seq. .................................................................................................14

71686/0001-53374918

NY UCC § 9-610 ..................................................................................................................12

Uniform Commercial Code Article 9 .................................................................... *passim*

**Other Authorities**

N.J. Admin. Code § 17:30-9.4(l) ........................................................................................18

71686/0001-53374918

## **PRELIMINARY STATEMENT**

This application presents a straightforward question: may a defaulting borrower refuse to let its senior secured lender inspect the collateral?  The answer is no.  Plaintiffs Advanced Flower Capital Inc. and AFC Agent LLC (collectively, "Plaintiffs" or "AFC") seek an order restraining Defendants from obstructing AFC's contractual right to access and inspect the collateral securing their loan.  This is a right AFC bargained for, paid for, and is entitled to exercise now that the loan has matured and Defendants have defaulted.  It is one of secured creditor's core rights  – the ability to see and assess what secures more than $123 million in unpaid obligations.

The relevant facts are not in dispute.  In April 2021, AFC, along with certain co-lenders, extended a credit facility to Defendants, a network of cannabis companies operating in New Jersey and Pennsylvania, owned and controlled by attorneys Jon Loevy and Michael Kanovitz and operating under the name "Justice Grown."  The loan is governed by the Second Amended and Restated Credit Agreement, dated September 30, 2021.  The debt now exceeds $123 million.  The Maturity Date was May 1, 2026.  Defendants have not paid the loan back.

The contractual violations are apparent.  Section 5.4 of the Credit Agreement requires Defendants to permit AFC to visit, inspect, and appraise the properties securing the loan.  Section 14(b) of the Pledge Agreement requires Defendants to permit AFC to enter premises where collateral or books and records are located.  Defendants are violating both.  In doing so, Defendants are obstructing AFC's ability to carry out a commercially reasonable disposition under UCC § 9-610 while positioning themselves to later argue that any resulting sale is not commercially reasonable.  AFC asks only that the Court enforce Plaintiffs' contractual rights.

This relief is modest.  AFC is not asking for a money judgment.  AFC is not asking to seize assets.  AFC is asking for one thing:  stop Defendants from blocking access to the collateral.  AFC has agreed to honor the confidentiality provisions of the Credit Agreement and to accommodate

71686/0001-53374918

an authorized representative of the Borrowers during any inspection. This is one of the most basic protections a creditor possesses – the ability to see what secures the loan.

Defendants have responded to AFC's repeated, good-faith requests with delay, obstruction, and pretextual demands that appear nowhere in the Credit Agreement. Amongst other things, Defendants have demanded NDA requirements, protective-order prerequisites, and bans on photography just to enter the premises. None of these conditions is in the contract. And all of it is designed to run out the clock on a currently scheduled July 28, 2026 sale of AFC's collateral under Article 9 of the Uniform Commercial Code. Defendants' most recent letter to AFC fits the same pattern of obstruction. Shortly after AFC filed its Verified Complaint, Defendants sent a letter purporting to offer inspection, but again conditioned access on extra-contractual requirements, including advance identification of visitors and the resolution of unspecified "confidentiality concerns" to their satisfaction before any inspection may occur. Those conditions appear nowhere in the governing agreements, which already contain negotiated confidentiality protections. This is not compliance – it is a transparent and futile attempt to moot AFC's request for relief without providing the unqualified access the contracts require.

In sum, whatever disputes may exist between the parties, they do not excuse Defendants from honoring the covenants they made when they accepted millions of dollars in financing. A borrower that takes the money, refuses to repay it, and then bars its lender from even looking at the collateral should not be heard to complain when a court tells it to stop blocking the door.

## STATEMENT OF FACTS

### A.     The Loan and Its Governing Documents

Plaintiff Advanced Flower Capital Inc. is a publicly traded lender that originates and manages senior secured loans. Plaintiff AFC Agent LLC is the administrative agent for the lender group under the Credit Agreement.

2

On September 30, 2021, the parties, along with certain co-lenders, entered into the Second Amended and Restated Credit Agreement (the "Credit Agreement"), which increased the total loan facility to $75,400,000.  (See Verified Complaint ("VC"), attached to Fierro Cert. as Exh. 1).  On August 26, 2022, the facility was further amended to increase the total commitment to $83,400,000.  (VC, ¶ 33).

AFC's "Collateral" securing its loan includes the real property owned by Borrowers (and pledged to secure their loan) and (among other things) Borrowers buildings, fixtures, and equipment.  It does not, however, include cannabis plants or any other property the possession of which is prohibited by state or federal law.  Indeed, the Borrowers' Security Agreement expressly excludes from "Collateral" any asset the pledge of which is prohibited by applicable law or cannabis law.  (See Security Agreement, attached to Fierro Cert. as Exh. 2, § 2(q)(i)).

### B.    The Maturity Default.

The Credit Agreement defines the "Maturity Date" as "the first day of the month immediately following the five (5) year anniversary of the Closing Date."  (VC, Exh. A).  The Closing Date was April 29, 2021.  Accordingly, the Maturity Date was May 1, 2026.  (VC, ¶ 45).  Section 3.4 of the Credit Agreement provides that on the Maturity Date, "all of the Obligations immediately shall become due and payable without notice or demand."  (VC, Exh. A).

On April 20, 2026, AFC sent the Borrowers a maturity statement indicating a Total Payoff Amount of $114,804,068.03, exclusive of default interest accrued and outstanding.  (VC, ¶ 47).  On May 1, 2026, all outstanding Obligations became due and payable.  As of the Maturity Date, the outstanding Obligations, including principal (inclusive of all PIK Interest accrued to principal), accrued and unpaid interest, fees, costs, expenses, and other amounts, totaled at least $123,000,000.

3

71686/0001-53374918

The Borrowers have not repaid any principal on or after the Maturity Date, nor has any principal been paid as of the date of this filing.  The Borrowers' failure to repay all outstanding Obligations constitutes a breach of the Credit Agreement and an Event of Default under Section 8.1(a).  (VC, ¶ 51).

### C.   AFC's Contractual Right to Inspect and Access Collateral.

Section 5.4(a) of the Credit Agreement expressly requires the Borrowers to:

> Permit Agent, each Lender and their duly authorized representatives or agents to (i) visit any of its properties and inspect any of its assets or books and records, to examine and make copies of its books and records, and to discuss its affairs, finances, and accounts with, and to be advised as to the same by, its officers and employees and (ii) cause the Real Property to be appraised by an appraiser selected by Agent (provided that (A) an authorized representative of the Loan Parties shall be given an opportunity to be present and (B) so long as no Event of Default shall have occurred during a calendar year, Agent and the Lenders shall not conduct more than one (1) inspection per calendar year) at such reasonable times and intervals as Agent may designate and, so long as no Event of Default exists, with reasonable prior notice to the Borrower Representative and during regular business hours.

(VC, Exh. A).  Any limitations on frequency and prior notice apply only "so long as no Event of Default exists."  Where, as here, multiple Events of Default have occurred and are continuing, those limitations fall away entirely.  AFC may thus exercise its inspection and appraisal rights as often as it determines is necessary, at such times as the Agent designates.

In addition, Section 14(b)(i) of the Pledge Agreement requires that, "[u]pon the request of the Agent during the continuance of an Event of Default, each Pledgor will [a]ssemble and make available to Agent the Collateral and all books and records relating thereto at any commercially reasonable place or places specified by Agent."  (VC, Exh. D).  Section 14(b)(ii) further provides that each Pledgor must "[p]ermit Agent, by Agent's representatives and agents, to enter, occupy

4

71686/0001-53374918

and use any premises where all or any part of the Collateral, or the books and records relating thereto, or both, are located, to take possession of all or any part of the Collateral[.]"  (Id.).

Failure to comply with the inspection obligations under Section 5.4 of the Credit Agreement is itself an independent Event of Default under Section 8.1(a)(i) of the Credit Agreement, which provides that failure to observe the covenants in Section 5.4 (Inspection; Appraisals) constitutes an Event of Default if such failure continues for a period of ten Business Days after notice thereof.  (VC, Exh. A).

### D.    The Borrowers' Campaign of Obstruction.

Despite these contractual obligations, Defendants have refused to permit AFC to access the Collateral.  AFC has not been permitted to inspect the Collateral Properties in more than a year. (VC ¶ 78; Id., Exhs. E-F).  As the May 1, 2026 Maturity Date approached, AFC attempted to schedule an inspection.  Defendants responded with delay and refusal:

- **March-April 2026: Ignored requests and delayed dates.**  Between late March and May 2026, AFC made no fewer than five written demands to inspect the Collateral Properties.  The Borrowers initially did not reply.  When AFC followed up, the Borrowers offered dates more than six weeks away and reserved the right to postpone further, claiming they needed to perform their own internal review of the scope, cost, and approval of the inspections.  (VC, ¶¶ 58-61).

- **April 15, 2026: AFC agreed to the Borrowers' proposed date of May 11, 2026.** In an effort to move the matter, AFC agreed to conduct the site visits on a date the Borrowers themselves provided.  (VC, ¶ 62).

- **May 8, 2026: Borrowers revoked access and refused to provide records.**  The Borrowers refused to provide the requested information, stating they did not "feel comfortable sharing, particularly in light of the litigation between the entities." (VC, ¶ 66).  In the same communication, the Borrowers declared that they were "declining you, your appraiser, and advisor access to the facilities."  (Id.).

- **May 13, 2026: Borrowers demand NDA.**  The Borrowers falsely accused AFC of attempting to provide competitors with access to their proprietary information and, as a condition of any inspection, demanded that "any person or competitor who seeks to enter our facility will have to sign [an] NDA."  There is no such requirement in the Credit Agreement.  To the contrary, Section 17.7 of the Credit

5

Agreement contains a fully negotiated confidentiality provision applicable in these circumstances.  (VC, ¶ 69).

- **May 19, 2026: AFC confirms compliance with confidentiality provisions.**  AFC confirmed it would fully abide by the confidentiality provisions of the Credit Agreement and noted that the Borrowers had previously invited senior management from direct competitors to tour their facilities on multiple occasions over the prior three years.  (VC, ¶ 71).

- **May 25, 2026: Borrowers escalate.**  The Borrowers' President rejected AFC's confidentiality offer, continued to insist all visitors sign Defendants' own NDA, and accused AFC's inspection efforts of constituting "money laundering" and "stealing." (VC, ¶ 72).

- **May 26, 2026: AFC provides formal notice.**  Counsel for AFC sent a formal letter notifying Defendants that AFC would proceed with the inspection of the Ewing cultivation facility on May 29, 2026 at 11:00 a.m.  (VC, ¶ 73).

- **May 28, 2026: Borrowers invent new conditions.** Defendants responded with a four-page letter demanding that AFC identify all proposed visitors and their organizational affiliations, accused AFC of attempting to bring competitors into the facility to steal trade secrets, and insisted that a court-ordered protective order be in place before any inspection could proceed.  None of these conditions appears in Section 5.4 or anywhere else in the Credit Agreement.  AFC's counsel reiterated that Daniel Neville – AFC's CEO, who has visited Defendants' facilities numerous times – would be the sole visitor.  Defendants would not confirm access.  (VC, ¶¶ 74-75).

- **May 29, 2026: Continued obstruction.**  Defendants sent yet another letter purporting to "offer" access, but conditioning it once again on Mr. Neville signing their self-drafted NDA, prohibiting him from taking photographs, and pushing the inspection to "later next week or the week after."  (VC, ¶ 76).

- **June 12, 2026: Borrowers' futile attempt to moot this application.** Defendants sent a letter after this action was commenced purporting to offer inspection, but again conditioned access on extra-contractual requirements.  This "empty" offer is illusory and consistent with Borrowers' ongoing pattern of obstruction, seemingly aimed at mooting the present request for relief without providing unqualified access required by the parties' agreements.

Defendants' pattern is clear: each time AFC presses for access, Defendants respond with new conditions not found in the Credit Agreement.

6

71686/0001-53374918

### E.      The Forthcoming Article 9 Sale.

Following Defendants' default, AFC exercised its rights under Article 9 of the Uniform Commercial Code to conduct a disposition of the Collateral.  AFC has noticed a public auction for July 28, 2026.  (VC ¶ 65; Id., Exhs. E and F).  Defendants' refusal to permit access impairs AFC's ability to (among other things) assess the Collateral and facilitate due diligence for prospective purchasers.

### F.      The Limited Nature of the Status Quo Relief Sought.

AFC seeks only what the Credit Agreement and Pledge Agreement expressly provide: the ability to visit the Collateral Properties, inspect the assets and books and records, and conduct appraisals.  (VC, pp. 21-22).  AFC's CEO, Daniel Neville, who has visited these facilities numerous times, would be the primary visitor.  Moreover, AFC has agreed to comply with the confidentiality provisions of Section 17.7 of the Credit Agreement and to accommodate an authorized representative of the Borrowers during any inspection, as Section 5.4 contemplates. (VC, ¶¶ 70-71).  And, the Collateral at issue includes real property, buildings, equipment, fixtures, books and records, and other non-plant assets.

Each day that passes without access is a day AFC cannot determine whether the Collateral is being maintained or allowed to deteriorate.

## LEGAL ARGUMENT

**I.      AFC SATISFIES ALL FOUR FACTORS FOR PRELIMINARY INJUNCTIVE RELIEF AND IS ENTITLED TO AN ORDER RESTRAINING DEFENDANTS FROM OBSTRUCTING ITS CONTRACTUAL INSPECTION RIGHTS.**

A defaulting borrower cannot bar its secured lender from inspecting the collateral.  But that is precisely what Defendants are attempting to do here, and this Court should put a stop to it.

7

71686/0001-53374918

AFC seeks a preliminary injunction restraining Defendants from continuing to obstruct AFC's contractual right to access and inspect the collateral securing more than $123 million in unpaid obligations.  Under the well-established <u>Crowe v. De Gioia</u> framework, a preliminary injunction is warranted where the movant demonstrates: (i) a likelihood of success on the merits; (ii) irreparable harm absent relief; (iii) that the balance of hardships favors the movant; and (iv) that the public interest supports granting the injunction.  90 N.J. 126, 132-34 (1982).  Where, as here, the movant seeks only to preserve the status quo or to prevent the subject matter of the litigation from being "destroyed or substantially impaired," the requirement of showing likelihood of success is relaxed.  <u>Waste Mgmt. of N.J., Inc. v. Morris Cnty. Mun. Utils. Auth.</u>, 433 N.J. Super. 445, 453-54 (App. Div. 2013).

AFC satisfies each of these factors.[1]  The loan has matured.  Defendants have not repaid a single dollar of principal.  The Credit Agreement unambiguously requires Defendants to now permit inspection of the collateral.  Defendants have refused every demand for access since March 2026.  AFC cannot assess the condition of the collateral, cannot facilitate due diligence for the noticed July 28, 2026 Article 9 sale, and suffers compounding harm with each passing day.  Meanwhile, the only "hardship" Defendants face is being required to do what they contractually agreed to do.  There is no defense to this motion – only delay and obstruction.

---

[1] The substantive rights and obligations under the Credit Agreement and Pledge Agreement are governed by New York law.  (VC, Exh. A § 13(a); <u>Id.</u>, Exh. D § 23(b)).  New Jersey law governs the procedural standard for injunctive relief.

A.   **AFC Is Virtually Certain to Succeed on the Merits Because the Loan Has Matured, Defendants Have Not Repaid Any Principal, and the Credit Agreement Unambiguously Requires Defendants to Permit Inspection.**

This is not a close call. AFC is not asking the Court to order Defendants to do anything extraordinary. AFC is asking the Court to stop Defendants from blocking a secured creditor's access to its own collateral. That is a right AFC bargained for, paid for, and is entitled to enforce now that Defendants have defaulted on more than $123 million in obligations.

Under New York law, which governs the Credit Agreement, a breach of contract claim requires proof of "the existence of a contract, the plaintiff's performance pursuant to the contract, the defendant's breach of his or her contractual obligations, and damages resulting from the breach." Dee v. Rakower, 112 A.D.3d 204, 208-09 (2d Dep't 2013). Where a contract is unambiguous, its terms must be enforced as written. W.W.W. Assocs., Inc. v. Giancontieri, 77 N.Y.2d 157, 162 (1990). The Court need not look beyond the four corners of the agreement.

Here, every element is satisfied – and none can be legitimately contested. There are contracts: the Credit Agreement, Security Agreement, and Pledge Agreement, executed by sophisticated parties represented by counsel. AFC performed: it advanced tens of millions of dollars in financing. Defendants breached: the loan matured on May 1, 2026, Defendants have not repaid a single dollar of principal, and Defendants have refused every demand for access to the collateral since March 2026. And AFC suffers ongoing harm: it cannot assess the condition of the collateral, cannot facilitate due diligence for the noticed Article 9 sale, and faces compounding uncertainty with each passing day.

Two causes of action in AFC's Verified Complaint directly support this relief. The First Count (Breach of Credit Agreement – Maturity Default) establishes that the loan matured, no principal has been repaid, and an Event of Default exists. The Second Count (Breach of Credit

9

Agreement – Inspection Rights) establishes that Defendants have breached their affirmative covenant to permit inspection. (VC, ¶¶ 81-103). Neither the maturity obligation nor the inspection covenant is ambiguous. The text is clear. The breach is undisputed. AFC is likely to prevail.

> **1.     The Loan Matured on May 1, 2026, Defendants have failed to repay a single dollar of principal to AFC, and No Written Agreement Extends the Maturity Date.**

The maturity default is also undisputed. The Credit Agreement defines the Maturity Date as May 1, 2026. (VC, Exh. A § 1.1; VC, ¶ 85). Section 3.4 provides that on that date, "all of the Obligations immediately shall become due and payable without notice or demand." (VC, Exh. A, § 3.4; VC, ¶ 46). No notice was required. No demand was required. The debt became due by operation of the contract.

But at no point have Defendants repaid a single dollar of principal. (VC, ¶¶ 50, 88). Section 8.1(a) provides that failure to pay any amount within three Business Days of when due constitutes an Event of Default. (VC, Exh. A, § 8.1(a); VC ¶ 51). More than six weeks have passed since the Maturity Date. The Event of Default is indisputable.

Nor can Defendants claim the Maturity Date was extended. Section 15.1(a) requires unanimous written consent of all Lenders to modify the Maturity Date. (VC, Exh. A, § 15.1(a); VC, ¶ 46). No such writing exists. The loan matured on May 1, 2026, and the Borrowers now owe every penny. See W.W.W. Assocs., 77 N.Y.2d at 162 (unambiguous contract terms must be enforced as written).

> **2.     Section 5.4 of the Credit Agreement Grants AFC an Unqualified Right to Inspect the Collateral Upon Default, and Defendants Have Refused Every Demand Since March 2026.**

AFC's inspection right is not discretionary, nor is it subject to Defendants' approval. Section 5.4(a) grants AFC the unqualified right to "visit any of its properties and inspect any of its

10

71686/0001-53374918

assets or books and records." (VC, Exh. A; VC, ¶ 93). The right extends to "Agent, each Lender and their duly authorized representatives or agents" – including appraisers, consultants, and prospective purchasers. (VC, Exh. A, § 5.4(a)).

Upon an Event of Default, the inspection right becomes unconditional. Thus, there is no frequency cap, no advance notice requirement, and no limitation to business hours. (VC, ¶ 94). AFC may inspect as often as necessary, at such times as the Agent designates.

Defendants have no contractual basis to refuse. Yet Defendants have stonewalled access and rejected every one of AFC's requests since March 2026. (VC, ¶¶ 56-78). That refusal is not merely a breach of the inspection provision – it is itself an independent Event of Default. Section 8.1(a)(i) of the Credit Agreement provides that failure to observe the covenants in Section 5.4 constitutes a default if such failure continues for ten Business Days after notice. (VC, Exh. A § 8.1(a)(i)). AFC provided formal notice. More than ten Business Days have passed. Defendants remain in default on this ground alone, independent of the maturity default.

### 3. The Security Agreement and Pledge Agreement Independently Require Defendants to Assemble and Make Available All Collateral and Books and Records.

The Credit Agreement is not the only source of AFC's inspection rights. The Security Agreement and Pledge Agreement impose independent, affirmative obligations on Defendants to make the collateral available, which obligations exist separately from Section 5.4 and that Defendants are separately breaching.

Specifically, Section 16(b)(i) of the Security Agreement requires Grantors to "[a]ssemble and make available to Agent the Collateral and all books and records relating thereto at any commercially reasonable place or places specified by Agent." (Fierro Cert., Exh. 2). This is not

11

a passive obligation. Defendants must affirmatively gather the collateral and present it for inspection. They have done the opposite.

Section 14(b)(i) of the Pledge Agreement independently requires Pledgors to "[a]ssemble and make available to Agent the Collateral and all books and records." (VC, Exh. D; VC ¶ 106). Section 14(b)(ii) goes further: it requires Pledgors to "[p]ermit Agent, by Agent's representatives and agents, to enter, occupy and use any premises where all or any part of the Collateral, or the books and records relating thereto, or both, are located." (VC, Exh. D, § 14(b)(ii)). Defendants are violating both provisions. These are not ambiguous covenants, and Defendants have no excuse for noncompliance. Their refusal is unadorned breach.

> **4.   Defendants' Deliberate Obstruction Is a Calculated Strategy to Sabotage the Commercially Reasonable Disposition of Collateral and Manufacture a Future Challenge to the Article 9 Sale.**

Whatever Defendants' motivations, the effect of their obstruction is clear: it undermines AFC's ability to conduct the upcoming Article 9 sale in the most efficient and well-supported manner possible. Defendants' refusal to permit inspection creates unnecessary risk, friction, and uncertainty – none of which serves any legitimate interest.

Under UCC § 9-610, every aspect of a secured party's disposition of collateral, including method, manner, time, place, and terms, must be commercially reasonable. A commercially reasonable sale is supported by (among other things) an understanding of the collateral's condition and the provision to prospective purchasers of meaningful information. See, e.g., CCO Condo Portfolio (AZ) Junior Mezzanine, LLC v. Feldman, 717 F. Supp. 3d 331, 339-41 (S.D.N.Y. 2024) (rejecting challenge to Article 9 sale, describing sale process). AFC is trying to take precisely those steps. Defendants are deliberately blocking them.

12

By denying access to the Collateral Properties, Defendants are preventing AFC from inspecting, inventorying, and appraising the assets.  Moreover, the refusal to produce books and records is a transparent effort to limit the information available to prospective purchasers.  By imposing escalating conditions on access (including NDA demands, protective-order prerequisites, and bans on photography) Defendants are compressing the timeline for the July 28, 2026 auction.  (VC, ¶¶ 149-51).  Each of these obstacles is extra-contractual and of Defendants' own creation.

AFC should not be forced to conduct the UCC sale under conditions that Defendants have unilaterally imposed in violation of Defendants' contractual obligations.  AFC is entitled to access its collateral now, not on whatever terms Defendants choose to dictate.

> **5.      Defendants' Anticipated Defenses, Including a Now-Mooted Federal Injunction and Any Illegality Arguments, Provide No Basis to Deny AFC Access to Its Collateral.**

Defendants have no defense to this motion.  AFC anticipates, however, that Defendants may point to a now-mooted and unrelated preliminary injunction entered in the District of New Jersey, and pending Third Circuit appeal of that injunction, to avoid their contractual duties.  But neither provides a basis to deny AFC access to its collateral.  The inspection right under Section 5.4 is not merely a post-default remedy, it is an ongoing affirmative covenant that Defendants owe at all times.  Default simply removes the frequency and notice limitations.  (VC, Exh. A, § 5.4(a); VC, ¶¶ 5, 54-55, 94).  Defendants' obligation to permit inspection thus exists independent of any dispute about other remedies.

*The Federal Injunction Does Not Apply*.  In May 2025, Judge Quraishi in the District of New Jersey issued a preliminary injunction prohibiting AFC from "seizing any of Plaintiffs' assets or cash . . . or seeking any remedy for default that is inconsistent with the parties' oral Reopening

13

Agreement." (<u>See</u> Preliminary Injunction Order, attached to Fierro Cert. as Exh. 3; <u>Hayden Gateway LLC v. Advanced Flower Capital Inc.</u>, No. 25-cv-02789-ZNQ (D.N.J.)).

That injunction is not relevant to the relief sought here. It was predicated on pre-maturity Forbearance Defaults – defaults that the federal court, on the record before it, found in a pre-discovery, preliminary ruling did not exist. (VC, ¶¶ 43-44). The maturity default at issue here is entirely different. It occurred on May 1, 2026 – a full year after the injunction was entered – and was never litigated in front of or addressed by Judge Quraishi. Indeed, Judge Quraishi himself even confirmed that the injunction did not address the parties' rights at maturity. The Verified Complaint in this action explicitly disclaims reliance on any Forbearance Default, and AFC is not seeking to "seize" assets or enforce any other (unpled agreement). AFC is seeking to inspect collateral pursuant to an unambiguous contractual right that exists independent of any default. The federal injunction simply has no application here.

***The "Illegality" Question Is Irrelevant***. AFC's appeal of the federal injunction is pending before the Third Circuit. During oral argument, the panel raised questions about whether federal courts may enforce cannabis-related contracts under the federal "illegality" doctrine.[2] But this Court need not reach any illegality question. AFC is not asking to seize cannabis. AFC is simply asking to inspect buildings, equipment, fixtures, and books and records. Indeed, Defendants' own counsel conceded to the Third Circuit that the loan's financial covenants are enforceable and "not a violation of the CSA." (Oral Arg. Tr. at 21:24-22:3, attached to Fierro Cert. as Exh. 4). The inspection rights AFC seeks are even further removed from cannabis than the payment provisions

---

[2] While the cultivation, distribution, and possession of cannabis is legal and subject to licensing in New Jersey under the Cannabis Regulatory, Enforcement Assistance, and Marketplace Modernization Act, N.J.S.A. 24:6I-31 <u>et seq.</u>, cannabis remains a controlled substance for purposes of the Controlled Substances Act.

14

Defendants' counsel already conceded are enforceable.  There is no illegality defense to this motion.

*Defendants' June 12, 2026 Letter* (June 12, 2026 Letter attached to Fierro Cert. as Exh. 5).  Defendants' post-Complaint letter does not moot AFC's request for relief. It does not provide the unqualified access required by the governing agreements but instead, again, conditions any inspection on extra-contractual requirements, including advance identification of visitors and the resolution of unspecified "confidentiality concerns" to Defendants' satisfaction.  A conditional offer to permit access on terms Defendants themselves dictate is not compliance and does not cure Defendants' ongoing breach.  Nor does it eliminate the live controversy before this Court.  Absent injunctive relief, AFC's contractual inspection rights remain subject to Defendants' unilateral control.

**B.      AFC Will Suffer Irreparable Harm Every Day It Cannot Inspect the Collateral Securing $123 Million in Unpaid Obligations, Particularly with the July 28, 2026 Article 9 Sale Approaching.**

AFC's harm is irreparable because no amount of money can undo it.  Harm is "irreparable" when it is material and incapable of being redressed by monetary damages.  Crowe, 90 N.J. at 132-33; Bd. of Educ. v. New Jersey Educ. Assoc., 96 N.J. Super. 371, 389 (App. Div. 1967), aff'd, 53 N.J. 29 (1968).  "In other words, plaintiff must have no adequate remedy at law."  Del. River and Bay Auth. v. York Hunter Constr., Inc., 344 N.J. Super. 361, 365 (Ch. Div. 2001).  AFC has no adequate remedy at law.  The collateral securing $123 million in obligations sits uninspected, its condition unknown, its value uncertain.  No after-the-fact damages award can give AFC what it needs today: the ability to see what it owns.

The Chancery Division's equitable powers exist precisely for circumstances like this – where absent prompt intervention "the subject matter of the litigation would be destroyed or

15

71686/0001-53374918

substantially impaired." Waste Mgmt., 433 N.J. Super. at 454; see also Gen. Elec. Co. v. Gem Vacuum Stores, 36 N.J. Super. 234, 236-37 (App. Div. 1955). AFC cannot wait for trial. The Article 9 sale is scheduled for July 28, 2026. By the time any trial concludes, the sale will have occurred, and AFC will have been forced to conduct it without ever having inspected the assets, and without allowing prospective buyers to inspect, which would significantly diminish any purchase offers.

The parties themselves agreed that this harm is irreparable. Section 17 of the Pledge Agreement provides that "a breach of any of the covenants contained in Section 14(b) . . . will cause irreparable injury to Agent and the Lender Group" and that "Agent and Lender Group have no adequate remedy at law." (VC, Exh. D). This was not a boilerplate term. It is an acknowledgment by sophisticated commercial parties, negotiated at arm's length, that access to collateral cannot be compensated by money and the refusal to allow such access can be remedied by interim injunctive relief.

The practical harms confirm what the contract recognizes. AFC has not been inside these properties in over a year. (VC, ¶¶ 3, 56, 78, 101). As such, AFC cannot verify whether the assets are being maintained, stripped, or allowed to deteriorate. The information asymmetry is total: Defendants know the condition of the collateral and AFC does not. That is not a harm that money can remedy.

Meanwhile, the clock is ticking. The Article 9 sale is six weeks away. Every day of continued obstruction compresses the timeline for AFC to assess the collateral and for prospective purchasers to conduct due diligence. (VC, ¶¶ 149-51). AFC should not be forced to proceed under these conditions when a simple court order can eliminate the obstruction.

16

71686/0001-53374918

Finally, there is reason for particular concern here. Defendants have a documented history of misappropriating loan proceeds, making restricted payments, and diverting funds exceeding $20 million. (VC, ¶¶ 9-10, 119-121). The refusal to permit inspection only heightens the urgency. See Marsellis-Warner Corp. v. Rabens, 51 F. Supp. 2d 508, 532 (D.N.J. 1999) (issuing preliminary injunction when "past financial manipulation of the Defendants and the potential future depletion or dissipation of assets still in the possession of the Defendants create a real and substantial risk money damages may ultimately be unobtainable." (citation omitted)). If Defendants have nothing to hide, they should have no objection to honoring their contractual obligations. Their continued obstruction of simple inspection rights is suggestive and the likely lack of future money damages make an "adequate remedy at law" even less likely.

### C. The Balance of Hardships Overwhelmingly Favors AFC Because the Relief Sought Is Modest, Defendants Bargained Away the Right to Exclude Their Secured Creditor, and Compliance Requires Only Honoring Existing Contractual Obligations.

The balance of hardships is not close. On one side: a secured lender owed $123 million, denied access to its collateral, facing a sale deadline in six weeks. On the other: defaulting borrowers being asked to honor a contractual obligation they negotiated, agreed to, and reaffirmed through multiple amendments and forbearances. The equities plainly favor AFC. See St. John's Evangelical Lutheran Church v. City of Hoboken, 195 N.J. Super. 414, 420 (Law Div. 1983); Gilpin v. Jacob Ellis Realty, Inc., 47 N.J. Super. 26 (App. Div. 1957).

The relief AFC seeks is modest. AFC is not asking for a money judgment. AFC is not asking the Court to order a UCC sale. AFC is not asking for the $123 million it is owed. AFC is asking for one thing: stop Defendants from blocking access to the collateral. This is one of the secured lender's core rights, to walk through the door, look at the collateral, and assess its condition. (VC, ¶ 56). It is the paradigm of equitable relief that Chancery courts are designed to

17

provide.  Moreover, AFC faces compounding harm without relief now.  It cannot assess the condition of the collateral, nor can it facilitate due diligence for prospective purchasers.  It also cannot prepare for the noticed July 28, 2026 Article 9 sale under conditions of its own choosing rather than conditions Defendants have unilaterally imposed.  (VC, ¶¶ 101, 103).

Defendants, by contrast, face no cognizable hardship.  Their only claimed concern — that competitors might see proprietary information — is already addressed by Section 17.7 of the Credit Agreement, which imposes confidentiality obligations that AFC has expressly agreed to honor.  (VC, Exh. A; id., ¶¶ 69-71).  Granting this injunction does not harm Defendants.  It simply requires them to do what they promised to do.

Defendants cannot now demand a separate NDA or a court-ordered protective order as a condition of access.  Those demands find no support in the Credit Agreement.  (VC, ¶¶ 6, 74, 99-100; VC, Exh. I).  Defendants bargained away the right to exclude their secured creditor when they pledged these properties as collateral.  If Defendants believe an inspection violates their rights, they can pursue that claim later.  But they cannot refuse to perform a clear contractual obligation while that dispute is being litigated.  The balance of hardships favors AFC.

### D. The Public Interest Strongly Supports Enforcing Negotiated Commercial Lending Agreements and Denying Defaulting Borrowers the Ability to Obstruct Their Creditors' Contractual Rights.

Contracts should be enforced.  That principle is foundational to commercial law and serves the public interest.  See Waste Mgmt., 433 N.J. Super. at 453 (equitable power "should be exercised whenever necessary to subserve the ends of justice").  As the Third Circuit has explained, "[t]he public has a strong interest in seeing that contract and property rights are respected. . . .  We see no reason why, having fulfilled its contractual duties, [plaintiff] is not entitled to enforce the

18

benefit of its bargain." Ride the Ducks of Philadelphia, LLC v. Duck Boat Tours, Inc., 138 Fed. App'x 431, 434-35 (3d Cir. 2005).

Cannabis regulation supports, rather than forestalls, equitable relief. The New Jersey Administrative Code expressly authorizes third-party visitors to cannabis facilities with an escort. See N.J. Admin. Code § 17:30-9.4(l) ("A visitor entering a cannabis business premises must be accompanied by an escort with a Cannabis Business Identification Card at all times, except in the consumer area of a cannabis retailer."); (VC, Exh. G). Thus, there is no regulatory bar in New Jersey (or other) law to the relief AFC seeks.

The public interest would of course be disserved by allowing defaulting borrowers to obstruct their creditors through litigation gamesmanship. Defendants accepted tens of millions of dollars in financing. They pledged their properties as collateral. They agreed to permit inspection. They have now defaulted on the loan, refused to repay a single dollar, and blocked every attempt by AFC to access the collateral. That is not a legitimate legal defense. It is obstruction. The Court should not reward it. Granting this motion enforces a bargain that Defendants freely made. Denying it would permit Defendants to escape their contractual obligations through delay and defiance. The public interest favors AFC.

## CONCLUSION

AFC's loan has matured, and Defendants have not repaid a single dollar of principal to AFC. In these circumstances, the governing contracts are clear. AFC is entitled to inspect its collateral. Defendants have no right to block the door, and no defense excuses their obstruction.

Thus, for the foregoing reasons, Plaintiffs AFC Agent LLC and Advanced Flower Capital Inc. respectfully request that this Court enter a preliminary injunction restraining Defendants from obstructing AFC's access to the Collateral Properties and from interfering with AFC's contractual

19

71686/0001-53374918

right to inspect the collateral and review books and records, pursuant to Section 5.4 of the Credit

Agreement and Section 14(b) of the Pledge Agreement.

Respectfully submitted,

**COLE SCHOTZ P.C.**
*Attorneys for Plaintiffs Advanced Flower Capital, Inc. and AFC Agent, LLC*


By:   */s/ Michael R. Yellin*
        Michael R. Yellin
        Brandon Fierro
        Kori P. Pruett
        Amber D. Morrison


Jason D. Sternberg (*pro hac vice application forthcoming*)
Kevin S. Reed (*pro hac vice application forthcoming*)
Jacob J. Waldman (*pro hac vice application forthcoming*)
Jacqueline M. Stykes (*pro hac vice application forthcoming*)
**QUINN EMANUEL URQUHART & SULLIVAN, LLP**
295 5th Avenue
New York, New York 10016-7103
Telephone: (212) 849 7000
Facsimile: (212) 849 7100

DATED:  June 16, 2026

20
